781 P.2d 605

**ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, a Delaware corporation, Black Mesa Pipeline, Inc., a Delaware corporation; Mountain States Telephone and Telegraph Company, and El Paso Natural Gas Company, a Delaware corporation, Plaintiffs–Appellants,**

v.

**ARIZONA DEPARTMENT OF REVENUE; Coconino County and Williams Hospital District, a special taxing district, Defendants–Appellees.**

No. 1 CA–CV 88–367.

Court of Appeals of Arizona, Division 1, Department D.

Sept. 5, 1989.

Reconsideration Denied Nov. 2, 1989.

Fennemore Craig, P.C. by Paul J. Mooney and Ren R. Hayhurst, Phoenix, for appellants Atchison, Topeka & Santa Fe Ry. Co., Black Mesa Pipeline, Inc. and Mountain States Tel. & Tel. Co.

Snell & Wilmer by Stephen A. Thomas, Tucson, for appellant El Paso Natural Gas.

Gust, Rosenfeld, and Henderson by Fred H. Rosenfeld and Joe R. Purcell, Phoenix, for appellee Williams Hosp. Dist.

John Verkamp, County Atty. by Terence C. Hance, Chief Deputy Atty., Flagstaff, for appellee Coconino County.

Robert K. Corbin, Atty. Gen. by Toni McClory and Michael G. Prost, Asst. Attys. Gen., Phoenix, for appellee Arizona Dept. of Revenue.

## OPINION

CONTRERAS, Judge.

In this civil appeal, this court considers the validity of a secondary property tax levied by the appellee Williams Hospital District pursuant to A.R.S. § 48–1907(6). We conclude that because the district did not "operate" the hospital facility as required by § 48–1907(6), the tax levied against the appellant real property owners was illegal. We therefore reverse the decision of the trial court upholding the validity of the tax and remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

The pertinent facts are not in dispute. In 1943, the Williams Hospital Board was incorporated to operate a health care facility in the Williams area. Construction of a hospital began in August 1948 and was financed with private funds and a $50,000 bond election. The hospital was dedicated on May 12, 1950.

The hospital had financial problems from the outset. From 1950 through 1970, the hospital provided only acute care services. In 1970, the hospital converted sixteen beds to long-term care to increase occupancy and revenues. In 1972, however, the hospital ceased providing long-term care, and reconverted to acute care beds only. In 1972, the city of Williams, which had operated the hospital since 1950, attempted to lease the hospital to a Flagstaff physician to resolve its financial problems. No agreement was reached, and in April of 1973, the hospital was closed and not reopened until the following October.

In early 1974, the Williams Hospital District (the district) was formed. At that time, the district incurred a bonded indebtedness of $500,000, including $250,000 to purchase the hospital from the city of Williams, and $250,000 to remodel it. In 1974, the total indebtedness was $887,700 including interest. The outstanding bonds require annual principal and interest payments of $49,000 through June of 1994.

From April 15, 1974, through August of 1986, the district leased the hospital to various organizations, but no lessee was able to operate it at a profit. On May 13, 1975, the city of Williams imposed a one percent sales tax to subsidize the hospital's operating costs and allow it to remain open. The city has supplemented its initial subsidy with additional funds at various times as needed. In 1979, the Northern Arizona Health Systems Agency investigated the

hospital's financial condition and advised the city that the hospital was losing money despite an annual subsidy which exceeded $150,000. In early 1986, the hospital stopped providing 24–hour service due to financial pressure.

On July 1, 1986, Samaritan Health Services, Inc. (Samaritan), which is not a party to this litigation, entered into a management agreement with the Williams Hospital District. On July 3, 1986, the district proposed the levy of a secondary tax pursuant to A.R.S. § 48–1907(6) in order to subsidize the hospital's operating expenses. The district's voters approved that tax on August 5, 1986. On August 29, 1986, the hospital again commenced to operate on a 24–hour basis. In fiscal year 1986–87, revenues collected from the secondary property tax provided about forty percent of the district's $150,000 budget.

The management agreement between Samaritan and the district provides that the district is to lease the hospital to Samaritan for the one-year period beginning July 1, 1986 for rent of $1 per year. The agreement provides for renewal for two additional one-year periods upon mutual agreement of the parties. It further provides that the district, Samaritan, and the city of Williams agree that their relationship is that of independent contractors rather than employees, principals, agents or joint venturers. The agreement provides in part:

3. *MANAGEMENT OF THE WILLIAMS FACILITY.* DISTRICT hereby retains SAMARITAN and SAMARITAN agrees to supervise, operate and manage the Williams facility subject to the terms and conditions set forth in this agreement. SAMARITAN shall be responsible for the operation and management of the Williams facility including the establishment and implementation of the facility's policies and standards affecting operation, services, maintenance, and pricing.

3.1 *Management Fee.* SAMARITAN shall be paid a management fee by DISTRICT for the supervision, operation and management of the Williams facility. This fee shall amount to forty thousand dollars ($40,000) per year. The fee shall be paid at a monthly rate of three thousand thirty-four dollars ($3,334) [sic] per month payable on the first of each month beginning on July 1, 1986. The management fee will be renegotiated on a yearly basis. DISTRICT and SAMARITAN further agree that all net profits will be allocated equally between DISTRICT and SAMARITAN during the calendar months such profit or revenue is obtained.

The agreement further provides:

3.4 *Employees.* Effective July 1, 1986, DISTRICT shall cease any further relationship it has directly or indirectly with each non-physician employee of the Williams facility. SAMARITAN shall staff the Williams facility with qualified personnel of SAMARITAN'S sole choosing, at such level of compensation and benefits as may be negotiated between the parties. It is anticipated that SAMARITAN will rehire those past employees of the Williams facility at salaries and wage levels currently experienced. All employees hired by SAMARITAN will receive SAMARITAN benefit packages, modified as necessary to be consistent with the employees' past benefits. Every effort will be made to hire existing Williams facility personnel, although SAMARITAN reserves the right of final selection of personnel.

3.5 *Medical Staff.* Effective July 1, 1986, DISTRICT shall cease any further relationship it has directly or indirectly with each physician providing coverage for the Williams facility. SAMARITAN shall forthwith enter into such arrangements as it deems advisable with physicians to provide coverage for the Williams facility. SAMARITAN'S board of directors, in all instances, may, for good cause, limit or deny any physician, surgeon or dentist the privilege to practice in the Williams facility.

The management agreement also requires Samaritan to indemnify the district for any claims or liabilities arising out of or connected with the use or operation of the hospital or the services provided by the employees of the hospital.

Appellants commenced two separate actions in October of 1987 to challenge the legality of the district's 1986 and 1987 secondary property taxes levied pursuant to A.R.S. § 48-1907(6). Appellants also requested awards of attorney's fees against the appellee Arizona Department of Revenue under A.R.S. § 12-348. The two actions were consolidated by stipulation of the parties. Appellants filed separate motions for summary judgment. The district opposed those motions and filed its own cross-motion for summary judgment. Coconino County joined in the district's response to appellants' motions for summary judgment, but not in the district's cross-motion for summary judgment.

The trial court denied appellants' motions for summary judgment, but granted the district's motion, although it failed to state its reasons for doing so. The trial court accordingly did not reach the question of whether appellants could recover their attorney's fees from the Department of Revenue under A.R.S. § 12-348. This timely appeal followed entry of formal judgment in accordance with the trial court's ruling.

### THE PARTIES' CONTENTIONS

The provisions of A.R.S. §§ 48-1907, 48-1910, and 48-1911 are at the heart of this appeal. Section 48-1907 provides in pertinent part:

A hospital district may:

. . . .

5. Provide for the operation and maintenance of a hospital or combined hospital and ambulance service owned by the district. If the hospital district provides for the operation of an ambulance service, ambulance services shall be provided to all areas within the district.

6. Impose a secondary property tax on all taxable property within the district for the purpose of funding the operation and maintenance of a hospital or combined hospital and ambulance service that is owned and operated by the district or to pay costs of an ambulance service contract entered into pursuant to this section. The amount of the levy necessary for the operation and mainte-

nance of the ambulance service shall be separately stated in the levy. Prior to the initial imposition of such a tax a majority of the qualified electors voting in a regular or special election must approve such initial imposition. The continued imposition of such a tax must be approved by a majority of the qualified electors voting in a regular or special election at least every five years from the date of the initial imposition.

Section 48-1910 provides:

The board of directors may purchase surgical instruments, hospital equipment, ambulance equipment and other property and supplies necessary for equipping a hospital or combined hospital and ambulance service, except that the board shall not purchase, rent or contract for the use of aircraft. The board may purchase real property, and erect or rent and equip buildings or rooms necessary for the hospital. The board of directors shall lease the hospital as provided by § 48-1911, provided however that when any bonded indebtedness of the district has been paid the board of directors may lease the hospital and its equipment to any person or corporation for the purpose of conducting a health care facility upon such terms and conditions as the board of directors of the district deems to be beneficial to the hospital district.

Section 48-1911 provides:

A. A lease of the hospital and its equipment, executed by the board of directors of the district, shall:

1. Contain terms and provisions necessary to assure compliance by the district with the provisions of the federal act and any amendments thereto.

2. Extend for a term to be determined by the board, but not less than five nor more than ten years.

3. Be executed to a corporation not for pecuniary profit, duly organized under the laws of this state for the purpose of conducting a hospital.

4. Provide for a rental upon terms and in an amount which will provide a fair return to the district on its investment, be sufficient to meet the payments

of principal and interest of bonds issued under this article, and provide amounts necessary to meet the expenses of the district.

B. If a lessee of the hospital and its equipment fails to make the payment of rental required by the lease, the board of directors of the district shall forthwith cancel the lease for such failure. If then unable to release the hospital and its equipment to a lessee under the provisions of this article at a rental qualified sufficient to meet the payments of principal and interest on any bonds issued by the district and to provide the amounts necessary to meet expenses of the district, the board shall, at public auction, offer to lease the hospital and its equipment to the highest responsible and qualified bidder for such term as the board prescribes, and shall lease the hospital and its equipment to the bidder who bids the highest rental for the prescribed period.

C. Notice of the auction shall be given in a newspaper as provided by § 48–1902 at least once each week for four weeks immediately preceding the auction.

Noting that the Williams Hospital District has outstanding bonded indebtedness, appellants contend that under the third sentence of A.R.S. § 48–1910, the district's board is required to lease the hospital in accordance with the terms of § 48–1911(A). Appellants assert that the district's management agreement with Samaritan fails to comply with § 48–1911(A) because it: 1) extends for a term of less than five years, and 2) does not require Samaritan to pay a rental sufficient to meet payments on the district's bonded indebtedness, meet the district's expenses, and provide a fair return to the district on its investment. Because the record establishes that the hospital has never been and cannot be leased in compliance with A.R.S. § 48–1911(A) or (B), appellants argue that the hospital must be closed, and that the trial court erred in failing to so declare.

In response, Williams Hospital District and Coconino County (hereinafter "appellees") urge that the third sentence of § 48–1910 should be interpreted to mean that the district becomes free to lease the hospital outside the strictures of § 48–1911(A) as soon as it has paid *some portion* of its total bonded indebtedness. Appellees note that by 1986, the district had made numerous payments toward its bonded indebtedness. They therefore argue that the district was not required to comply with A.R.S. § 48–1911(A) in leasing the hospital to Samaritan. Appellees also urge that the auction procedure provided by subsection (B) of § 48–1911 never applied in this case because the hospital was never previously leased under subsection (A) to a lessee who later defaulted on its rental payments.

The third sentence of A.R.S. § 48–1910 was added by Laws 1981, ch. 219, § 1. In that same year, hospital districts were authorized for the first time to impose secondary property taxes "for the purpose of funding the operation and maintenance of a hospital that is owned and operated by the district." Laws 1981, ch. 229. Both sides acknowledge that as of 1981, it was clear under *Roberts v. Spray*, 71 Ariz. 60, 223 P.2d 808 (1950), that hospital districts had no statutory authority to operate hospitals and could only lease them as provided by the statutory provisions now in effect as A.R.S. § 48–1911.[1]

From this point the parties' positions diverge. Appellants contend that by adding to § 48–1910 the language "[t]he board of directors shall lease the hospital as provided by [§ 48–1911] ..." in 1981, the legislature must have intended to clarify and limit the scope of hospital districts' new power to impose secondary property taxes under its contemporaneous amendment of the predecessor to § 48–1907(5) and (6). Appellants reason that a hospital district may impose a secondary property tax under A.R.S. § 48–1907(6) to fund the operation and maintenance of its hospital only if the

---

1. Former §§ 36–1231 through 36–1249, governing hospital districts, were renumbered as A.R.S. §§ 48–1901 through 48–1919 by Laws 1985, ch. 190, § 14. For clarity we refer to the relevant provisions by their current numbers wherever possible.

district has *no outstanding bonded indebtedness* and it is not required under § 48–1910 to lease its hospital pursuant to § 48–1911. Because the Williams Hospital District had outstanding bonded indebtedness, appellants argue that it therefore had no authority to impose a secondary tax under § 48–1907(6).

Appellants argue alternatively that even without considering the effect of § 48–1910, a district may impose a secondary property tax under § 48–1907(6) only if it "operates" its hospital. Appellants contend that because it is Samaritan that "operates" the district's hospital, the district is without authority to impose a secondary property tax under § 48–1907(6).[2]

Appellees offer a radically different interpretation of the 1981 amendments to A.R.S. §§ 48–1907(5) and (6) and 48–1910. They urge that the 1981 addition to § 48–1910 of the language "[t]he board of directors shall lease the hospital...." was entirely superfluous in view of *Roberts v. Spray, supra.* They also contend that the 1981 amendments to the predecessors of §§ 48–1907 and 48–1910 directly contradict one another, and must be construed to allow a hospital district to levy a secondary property tax under § 48–1907(6) whenever there is no qualifying lessee available to lease the hospital in accordance with § 48–1911 and the district's voters approve imposition of the tax.

Concerning the interpretation of A.R.S. § 48–1907(6) standing alone, appellees note that Laws 1984, ch. 106, § 1 amended the first sentence of that subsection to provide:

> A hospital district may: ... (6) Impose a secondary property tax on all taxable property within the district for the purpose of funding the operation and maintenance of a hospital *or combined hospital and ambulance service* that is owned and operated by the district *or to pay*

costs of an ambulance service contract entered into pursuant to this section.

(Amendment indicated by underlining). Applying the "rule of the last antecedent," appellees assert that this amendment eliminated the requirement that the "hospital" be "owned and operated by the district," and made that requirement applicable only to a "combined hospital and ambulance service," which the Williams Hospital District does not provide. Alternatively, appellees contend that if § 48–1907(6) requires a hospital district to "operate" its hospital before it may impose a secondary property tax, Williams Hospital District is fully in compliance with that requirement. They urge that a hospital district can operate and maintain its hospital through an independent contractor as well as through employees or agents. Appellees assert that the management agreement between Samaritan and the district is not a true lease, and that under it Samaritan is strictly a managing agent for the true operator of the hospital, the district.

## ANALYSIS

A number of settled principles guide our interpretation of the applicable statutes in this case. We are bound to construe statutes "liberally ... to effect their objects and to promote justice." A.R.S. § 1–211(B). *See State Farm Auto. Ins. Co. v. Dressler,* 153 Ariz. 527, 531, 738 P.2d 1134, 1138 (App.1987). The primary principle in statutory interpretation is to determine and give effect to the legislative intent behind the statute. To discover that intent, the appellate court may consider the context of the statute, the language used, the subject matter, the historical background, the effects and consequences, and the spirit and purpose of the law. *Martin v. Martin,* 156 Ariz. 452, 457, 752 P.2d 1038, 1043 (1988); *Calvert v. Farmers Ins. Co. of Arizona,* 144 Ariz. 291, 294, 697 P.2d 684, 687 (1985); *Arizona Newspapers*

---

**2.** Appellants also assert that the Williams Hospital District is using § 48–1907(6) revenues to cover payments on its bonded indebtedness and capital expenditures in addition to expenses of operating and maintaining the hospital. The record before us, however, does not indicate to what extent the district's bond installments and capital expenditures were covered by § 48–1907(6) revenues and how much, if any, was instead covered by taxes levied pursuant to A.R.S. §§ 48–1912(B) and 48–1914(B). In any event, we need not reach this question in view of our disposition of this appeal, *infra.*

*Ass'n, Inc. v. Superior Court*, 143 Ariz. 560, 562, 694 P.2d 1174, 1176 (1985). Further, unless it is plain that a different meaning was intended, words used in a statute are to be accorded their usual and commonly understood meaning. *Kilpatrick v. Superior Court*, 105 Ariz. 413, 421, 466 P.2d 18, 26 (1970). To determine and give effect to the legislative intent, a court may also consider the title or preamble of a statute. *Sullivan v. Green Mfg. Co.*, 118 Ariz. 181, 185, 575 P.2d 811, 815 (App.1977).

Statutes that relate to the same person or thing and have similar purposes are referred to as being *in pari materia.* Statutes *in pari materia* must be read together, and all parts of the law on the same subject must be given effect if possible. *Collins v. Stockwell*, 137 Ariz. 416, 419, 671 P.2d 394, 397 (1983). This principle applies with peculiar force when the statutes in question are adopted at the same session of the legislature. *State v. Jaastad*, 43 Ariz. 458, 462, 32 P.2d 799, 803 (1934). While ambiguous tax statutes should be liberally construed in favor of the taxpayer and strictly construed against the state, that rule must give way if it produces a result contrary to the evident legislative intent. *Department of Revenue v. Southern Union Gas Co.*, 119 Ariz. 512, 514, 582 P.2d 158, 160 (1978). Similarly, statutes are not to be interpreted woodenly and without regard for their aim, and if a literal interpretation of statutory language leads to an absurd result, the court has a duty to construe it, if possible, so that it is reasonable and workable. *State Farm Auto. Ins. Co. v. Dressler*, 153 Ariz. at 531, 738 P.2d at 1138. In interpreting statutes, it is the spirit of the law that prevails. *Id.*

We first review the history leading up to the 1981 amendments to the predecessors of A.R.S. §§ 48–1907(6) and 48–1910. As originally enacted by Laws 1949, ch. 27, § 7, the remote predecessor of §§ 48–1907 and 48–1911 provided:

The board of directors shall lease the hospital and its equipment for such term or period as it shall deem reasonable but not less than five (5) nor more than ten (10) years to a corporation not for pecuniary profit duly organized under the laws of the state of Arizona for the purpose of conducting a hospital; provided that the rental to be received upon such lease shall be upon such terms as will provide a fair return to the district on its investment and shall be sufficient to meet the payments of principal and interest of any bonds issued under the terms of this act, and such amounts as may be necessary to meet the expenses of the district.

Arizona Code Annotated § 68–1408(e)(1).[3]

In 1956, A.C.A. § 68–1408(a) through (d) were codified as A.R.S. § 36–1237, the predecessor of current § 48–1907. At the same time, subsection (e)(1) of A.C.A. § 68–1408 was codified as A.R.S. § 36–1241(A), (B) and (C) (now A.R.S. § 48–1911(A), (B) and (C)), with one notable change: the language "[t]he board of directors shall lease the hospital and its equipment ..." in the first clause became "[a] lease of the hospital and its equipment, executed by the board of directors of the district, shall...." A.R.S. § 48–1911(A). In view of our supreme court's earlier decision in *Roberts v. Spray*, 71 Ariz. 60, 223 P.2d 808 (1950), the omission of the mandatory lease language from the 1956 codification had no substantive effect because *Roberts* had already established that a hospital district had no authority to do anything with its hospital other than lease it in compliance with the provisions of what is now A.R.S. § 48–1911.

In its 1981 session, our legislature made two significant amendments to A.R.S. §§ 36–1237 and 36–1240, the immediate predecessors of current A.R.S. §§ 48–1907 and 48–1910. Laws 1981, ch. 229 was entitled:

An Act relating to public health and safety; prescribing powers of hospital dis-

---

**3.** The remainder of subsection (e)(1) consisted of provisions substantially equivalent to those now contained in A.R.S. § 48–1911(B) and (C), quoted *supra*, at 608–609. A.C.A. § 68–1409, later codified as A.R.S. § 36–1240, became the first sentence of current A.R.S. § 48–1910, quoted *supra*, at 608.

trict; providing for imposition of a secondary property tax under certain conditions, and amending §§ 36–1237 and 36–1244, Arizona Revised Statutes.

Section 1 of ch. 229 added a new subsection (5) to A.R.S. § 36–1237, which provided: A hospital district may:

....

5. Provide for the operation and maintenance of a hospital owned by the district, and impose a secondary property tax on all taxable property within the district for the purpose of funding the operation and maintenance of a hospital that is owned and operated by the district. Prior to the initial imposition of such a tax a majority of the qualified electors voting in a regular or special election must approve such initial imposition. The continued imposition of such a tax must be approved by a majority of the qualified electors voting in a regular or special election at least every five years from the date of the initial imposition.

At the same time, the legislature enacted ch. 219, which was entitled:

An Act relating to health; providing procedure for board of directors of hospital district to lease hospital; providing exception to procedure for leasing hospital; providing that hospital may be used as health care facility under certain conditions, and amending § 36–1240, Arizona Revised Statutes.

Section 1 of ch. 219 amended § 36–1240 to add the underlined language:

The board of directors may purchase surgical instruments, hospital equipment and other property and supplies necessary for equipping a hospital. The board may purchase real property, and erect or rent and equip buildings or rooms necessary for the hospital. *The board of directors shall lease the hospital as provided by § 36–1241* [§ 48–1911] *provided however that when any bonded indebtedness of the district has been paid the board of directors may lease the hospital and its equipment to any person or corporation for the purpose of conducting a health care facility upon such terms and conditions as the board of directors of the district deems to be beneficial to the hospital district.*

Chapters 229 and 219 of Laws 1981 were both passed by the Senate and the House on April 24, 1981 and approved by the Governor on April 27, 1981. 1981 Journal of the Senate, at 959, 976–77.

■ Based in part on the legislative history preceding the 1981 amendments, and in part on the language of the amendments themselves, we interpret the legislative intent behind those amendments differently from both appellants and appellees. As we have noted, prior to the 1981 amendments, a hospital district's only option was to lease its hospital as provided by the predecessor to A.R.S. § 48–1911 because, under *Roberts v. Spray,* a hospital district could not operate its own hospital. Then, in 1981, through Laws 1981, ch. 229, the Arizona Legislature for the first time gave hospital districts statutory authority to operate their own hospitals and impose secondary property taxes to fund their operation and maintenance. Concurrently, through Laws 1981, ch. 219, the Arizona Legislature also added the third sentence of current A.R.S. § 48–1910, which appellants now argue imposes on hospital districts a mandatory obligation to lease their hospitals in accordance with A.R.S. § 48–1911 if they have outstanding bonded indebtedness.

Despite the arguably absolute language of that amendment ("[t]he board of directors shall lease the hospital as provided by [§ 48–1911], provided however ..."), we think it highly unlikely that the legislature intended to impose a mandatory leasing requirement on hospital districts with bonded indebtedness at the same time it authorized all hospital districts, in unqualified terms, to operate their own hospitals and impose secondary property taxes for their support. We think it far more likely that the 1981 addition of the third sentence of A.R.S. § 48–1910 was instead intended to serve a more limited function.

We note that from the very beginning, hospital districts were granted the power to "[p]urchase, receive, have, take, hold, *lease,* use and enjoy property of every kind

and description within the limits of the district, and control, dispose of, convey, encumber and *create leasehold interests in* such property for the benefit of the district." A.R.S. § 48–1907(3) (emphasis added). As previously noted, prior to the 1981 amendments, no hospital district, whether or not it had outstanding bonded indebtedness, could do anything with its hospital other than lease it according to the prescribed conditions of A.R.S. § 48–1911 and its predecessors. Against that background, and in view of the contemporaneous amendment to § 48–1907, we believe that the purpose of the 1981 amendment to § 48–1910 was not to reimpose an overriding mandatory leasing requirement on hospital districts with bonded indebtedness, but rather, to free hospital districts that had no bonded indebtedness from the mandatory provisions to which § 48–1911 and *Roberts v. Spray* formerly subjected any hospital district's lease.

The legislature appears to have accomplished this purpose in two stages. First, it stated that if a hospital district with bonded indebtedness chose to exercise its authority under § 48–1907(3) to lease its hospital instead of its new authority under § 48–1907(5) and (6) to operate the hospital on its own, then "[a] lease of the hospital and its equipment" would still have to comply with A.R.S. § 48–1911, as under preamendment law. Second, in the proviso to the 1981 language amending § 48–1910, the legislature set forth the core provision of the amendment: if a hospital district had no bonded indebtedness, it was now empowered to lease its hospital without regard to the strictures of § 48–1911, and could include in the lease any terms its board deemed beneficial to the district.

A number of considerations support the foregoing interpretation of the seemingly contradictory 1981 amendments to §§ 48–1907 and 48–1910. As we have noted, on the same day it added the language in question to § 48–1910, the legislature added unqualified language that allowed hospital districts to operate their own hospitals for the first time. A.R.S. § 48–1907(5) and (6). The fact that these amendments were added on the same day, strongly suggests that the legislature intended to grant this authority to hospital districts as a new and independent alternative to their formerly exclusive authority to lease their hospitals. In addition, the title to Laws 1981, ch. 219, which amended § 48–1910, described the function of the amending language as "providing *procedure* for board of directors of hospital district to lease hospital; providing *exception to procedure* for leasing hospital;" (emphasis added). This description plainly does not suggest an intention to impose a mandatory leasing requirement, and instead signals an intent merely to regulate the manner in which a district may exercise its leasing authority under § 48–1907(3), assuming it chooses to do so at all.

■ Further, § 48–1907, as amended in 1981, does not condition the exercise of a hospital district's new authority to operate its hospital, and levy a secondary property tax for that purpose, on the district's freedom from bonded indebtedness. It conditions that authority only on initial approval and periodic reapproval by a majority of the district's qualified electors. Similarly, the 1981 amendment to § 48–1910 focuses exclusively on the conditions and terms under which a hospital district may lease its hospital, and does not purport to condition a district's right to operate its hospital under § 48–1907(5) and (6) on payment of its bonded indebtedness.

■ Finally, as amended in 1981, § 48–1907(5) and (6) obviously presuppose that the hospital in question is not producing enough income to make possible a lease in compliance with § 48–1911, but instead, needs additional subsidization to continue operation. In contrast, the 1981 amendment to § 48–1910, which expressly incorporates the requirements of § 48–1911, presupposes a hospital that is a going concern. This strongly indicates that amended §§ 48–1907(5) and (6) and 48–1910 were intended to establish two mutually exclusive approaches to be followed under different sets of circumstances. Accordingly, we hold that any hospital district, whether or not it has outstanding bonded indebted-

ness, may impose a secondary property tax without regard to § 48–1910, provided it complies with § 48–1907(6).[4]

As amended in 1984, § 48–1907(6) states:

A hospital district may:

. . . .

6. Impose a secondary property tax on all taxable property within the district for the purpose of funding the operation and maintenance of a hospital *or combined hospital and ambulance service* that is owned and operated by the district *or to pay costs of an ambulance service contract entered into pursuant to this section.*

(Amendments indicated by underlining.). Appellees contend that the 1984 amendment to A.R.S. § 48–1907(6) operated to remove from that section the implicit requirement that a hospital district "operate" its hospital as a condition precedent to its power to impose a secondary property tax to fund the hospital's operation and maintenance. We disagree.

It is clear from the pre-amendment language that the district could only impose a secondary property tax to fund the operation and maintenance of a hospital if it owned and operated the facility. It is also evident that the only purpose of the 1984 amendments to the first sentence of subsection (6) was to include within the permissible purposes for which a secondary property tax could be imposed the funding of an ambulance service contract or a combined hospital and ambulance service. Further, the location within that sentence in which the legislature inserted the words "or combined hospital and ambulance service" quite obviously demonstrates that it intended both the term "hospital" and the new term "combined hospital and ambulance service" to be modified by the phrase "that is owned and operated by the district." As appellants correctly note, the rule of the last antecedent on which appellees rely is inapplicable if the context or clear meaning of the statute dictates otherwise. *Tanner*

*Cos. v. Arizona State Land Dep't,* 142 Ariz. 183, 189, 688 P.2d 1075, 1081 (App. 1984). The import of the 1984 amendment to § 48–1907(6) is clear, therefore, the rule of the last antecedent is inapposite here.

*State v. Laemoa,* 20 Or.App. 516, 533 P.2d 370 (1975), on which appellees rely, is distinguishable. In that case the Oregon Criminal Abandonment Statute applied to the "parent, lawful guardian or other person lawfully charged with the care and custody of a child. . . ." *Id.* at 518, 533 P.2d at 372. The defendant was the parent of the child in question, and she was charged with abandonment under the statute. She argued that the indictment did not adequately state an offense because it did not allege that she was "lawfully charged with the care and custody" of the child. *Id.* Applying the rule of the last antecedent, the court held that that phrase applied only to the term "other person," and that the indictment's allegation that defendant was the child's "parent" was sufficient. *Id.* at 518–19, 333 P.2d at 372–73. Unlike the situation in *Laemoa,* both the context of the language in § 48–1907(6) and the manner in which it was amended in 1984 militate strongly against application of the rule of the last antecedent here. Accordingly, the Williams Hospital District had authority under § 48–1907(6) to impose a secondary property tax to fund the operation and maintenance of the hospital only if the district actually "operated" the facility.

■ Contrary to the district's argument, the provisions of its management agreement with Samaritan directly contradict the view that the district actually operates the hospital facility. Under Paragraph 3 of the agreement, the district expressly retains Samaritan to "supervise, operate and manage" the Williams facility, and Samaritan is responsible "for the operation and management of the Williams facility including the establishment and implementation of the facility's policies and standards af-

---

**4.** We hold that any hospital district may impose a secondary property tax so long as the district complies with the provisions of § 48–1907(6). Therefore, we proceed to determine whether the Williams Hospital District has complied with the statutory requirements in imposing the tax at issue in this case. Accordingly, we render no opinion on whether the lease executed between the district and Samaritan complies with the terms of § 48–1911.

fecting operation, services, maintenance, and pricing." Under Paragraph 3.1, Samaritan receives a $40,000 annual management fee for supervising, operating, and managing the Williams Hospital facility. The agreement also provides that Samaritan is to staff the hospital with qualified non-physician personnel of its own choosing who are all to be employees of Samaritan. Similarly, it is Samaritan that is to enter into "such arrangements as it deems advisable with physicians to provide coverage for the Williams facility." Further, Samaritan is an independent contractor, not the district's agent, and Samaritan is required to indemnify the district against any liabilities arising out of the use or operation of the Williams Hospital facility.

The district's contention that it actually "operates" the Williams facility is, in short, untenable. The district has pointed to nothing in the record in support of its contention. The district certainly owns the Williams facility, but it is exclusively operated by Samaritan. Accordingly, we conclude that the district lacked authority under A.R.S. § 48–1907(6) to impose a secondary property tax to fund the operation and maintenance of the Williams Hospital.

### ATTORNEY'S FEES

■ Appellants brought the consolidated actions under authority of A.R.S. § 42–204(C), which provides in part:

> Within one year after payment of the first installment of the tax, an action may be maintained to recover any tax illegally collected, and if the tax due is determined to be less than the amount paid, the excess shall be refunded in the manner provided by this title.

Subsection (D) of that section provides: "The department shall be a party to any action brought pursuant to this section." Appellants joined the Arizona Department of Revenue as a defendant in these actions as required by § 42–204(D). In both actions, appellants sought to recover their attorney's fees from the Department of

Revenue pursuant to A.R.S. § 12–348(A)(2),[5] which provides:

> A. In addition to any costs which are awarded as prescribed by statute, a court shall award fees and other expenses to any party other than this state or a city, town or county which prevails by an adjudication on the merits in any of the following:
>
> ....
>
> 2. A civil action brought by the party against the state, a city or town to challenge the assessment or collection of taxes.

Because appellants lost in the trial court, the trial court did not consider whether attorney's fees were awardable against the Department of Revenue under this statute.

In their joint opening brief, appellants urge that in the event this court reverses the trial court's rulings on appellants' claims for relief, these cases should be remanded to allow the trial court to consider and rule on appellants' claims for attorney's fees incurred in the lower court and on appeal. In its answering brief, however, the Department of Revenue notes that under Rule 21(c), Arizona Rules of Civil Appellate Procedure, and *Lacer v. Navajo County*, 141 Ariz. 392, 687 P.2d 400 (App.1984), this court may award attorney's fees for work done in the trial court where the losing party in the trial court prevails on appeal, and therefore urges that we address the question of whether the Department of Revenue may be liable for an award of fees under A.R.S. § 12–348(A)(2).

The department argues that it never took a position on the merits adverse to appellants in the trial court on appellants' claims against the Williams Hospital District, and, in fact, took no position at all except to disclaim liability for attorney's fees. The department also urges that § 12–348 is inapplicable to this case because subsection (G)(4) provides:

> This section does not:
>
> ....

---

**5.** Appellants Santa Fe, Black Mesa, and Mountain States Telephone pressed their claim for an award of attorney's fees in their motion for summary judgment below, but appellant El Paso Natural Gas did not.

**138**

Apply to ... proceedings in which the state or a city, town or county is a nominal party.

In their separate reply brief on the attorney's fees issues, appellants Santa Fe, Black Mesa Pipeline, and Mountain States Telephone ("fees appellants") note that § 12–348(A)(2) allows awards of attorney's fees only against cities, towns, and the state, and not against counties or special taxing districts like the Williams Hospital District. The "fees appellants" contend that the Department of Revenue's status as an "indispensable" party to this action compensates for the absence of authority in § 12–348(A)(2) for awards of attorney's fees in tax matters against counties, and therefore allows taxpayers who would otherwise seek recovery of fees against a county to recover their fees against the state. The "fees appellants" urge that it would be unfair to make taxpayers bear the costs of their own fees for overturning an illegal tax, and that the Department of Revenue is best able to pay those fees.

The "fees appellants" also contend that the Department of Revenue is not a "nominal" party under A.R.S. § 12–348(G)(4) because it has a real and substantial interest in the outcome of this case as the overall administrator of Arizona's property tax laws. They further argue that it would contravene the legislative intent behind A.R.S. § 12–348(A)(2) if the Department of Revenue were allowed to control a taxpayer's ability to recover attorney's fees in a property tax challenge case by deciding after the action is commenced whether or not to take a position on the merits. The fees appellants also contend that *Cortaro Water Users' Ass'n v. Steiner*, 148 Ariz. 314, 714 P.2d 807 (1986), and *Mission Hardwood Co. v. Registrar of Contractors*, 149 Ariz. 12, 716 P.2d 73 (App.1986), are inapplicable because the instant case does not involve a judicial review of an agency's quasi-judicial decision.

We conclude that the Department of Revenue is exempt from liability for attorney's fees in this case pursuant to A.R.S. § 12–348(G)(4). The "fees appellants" correctly note that *Cortaro* and *Mission*

*Hardwood* arose in the context of judicial reviews of agency decisions in which attorney's fees were sought against the agencies pursuant to A.R.S. § 12–348(A)(3). In neither case, however, was the court's rationale limited to considerations peculiar to subsection (A)(3). In our view, both cases stand for the proposition that a state agency's status as a "nominal" party under A.R.S. § 12–348(G)(4) depends on whether it adopts the role of an advocate on the merits of the litigation.

In this case, the Department of Revenue carefully avoided taking any position on the merits either in the trial court or on appeal. Therefore, the department was purely a nominal party within the meaning of A.R.S. § 12–348(G)(4), and fees cannot be awarded against it. Division Two of this court recently reached the same conclusion in a similar case. *See Arizona Tax Research Ass'n v. Maricopa County*, 162 Ariz. 94, 781 P.2d 71 (1989). The "fees appellants" public policy objections to this result are in reality arguments against the wisdom of A.R.S. § 12–348(G)(4), and should be directed to the legislature.

Reversed and remanded for proceedings consistent with this opinion.

GRANT, P.J., and FIDEL, J., concur.